```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                   |
KEN WIWA, et al.,                  |
                                   |
              Plaintiffs,          |
                                   |      96 Civ. 8386 (KMW) (HBP)
      -against-                    |
                                   |      _____
ROYAL DUTCH PETROLEUM CO., et al., |
                                   |
              Defendants.          |
                                   |
-----------------------------------X
                                   |
KEN WIWA, et al.,                  |
                                   |
              Plaintiffs,          |
                                   |      01 Civ. 1909 (KMW) (HBP)
      -against-                    |
                                   |
BRIAN ANDERSON,                    |
                                   |
              Defendant.           |
                                   |
-----------------------------------X
                                   |
ESTHER KIOBEL, et al.,             |
                                   |
              Plaintiffs,          |
                                   |      02 Civ. 7618 (KMW) (HBP)
      -against-                    |
                                   |       OPINION & ORDER
ROYAL DUTCH PETROLEUM CO., et al., |
                                   |
              Defendants.          |
                                   |
-----------------------------------X
```

KIMBA M. WOOD, U.S.D.J.:

Defendants Shell Petroleum, N.V. and Shell Transport and Trading Co., Ltd. ("Defendants") in Wiwa v. Royal Dutch Petroleum Co., 96 Civ. 8386 ("Wiwa"), move, pursuant to Federal Rule of Civil Procedure 12(b)(1), to dismiss the Racketeer Influenced and

1

Corrupt Organizations Act ("RICO") claims brought by <u>Wiwa</u> plaintiffs Owens Wiwa and Karololo Kogbara ("Plaintiffs") for lack of subject matter jurisdiction. (96 Civ. 8386 D.E. ("96-D.E.") 308.)

Among the ways that plaintiffs can establish that a court has subject matter jurisdiction over a RICO claim that involves foreign parties and racketeering activity that occurred outside the United States (an "extraterritorial" RICO claim), is to establish that the alleged racketeering activity had sufficient effects in the United States. They may also have to establish that these effects were intentional.

Here, Plaintiffs argue that Defendants' alleged racketeering activity, which occurred primarily in Nigeria, was intended to and did affect the United States by lowering Defendants' costs for producing Nigerian oil, which, in turn, gave Defendants a competitive advantage and/or increased profits in the United States. (<u>See</u> <u>generally</u> Pls.' Mem. L. Opp'n Defs.' Mot. Dismiss RICO Claims ("Pls.' Opp'n"), 96-D.E. 313.)

Defendants contend that Plaintiffs have failed to demonstrate that the racketeering activity Plaintiffs allege had effects in the United States sufficient to give the Court subject matter jurisdiction over Plaintiffs' extraterritorial RICO claims. (<u>See</u> <u>generally</u> Defs.' Mem. L. Supp. Rule 12 (b)(1) Mot. Dismiss Pls.' RICO Claim for Lack Subj. Matter Jd. ("Defs.' Mem.

2

L."), 96-D.E. 309; Defs.' Reply Mem. L. Supp. Rule 12(b)(1) Mot.
Dismiss Pls.' RICO Claim for Lack Subj. Matter Jd. ("Defs.'
Reply"), 96-D.E. 328.)

As explained in further detail below, the Court GRANTS
Defendants' Rule 12(b)(1) motion to dismiss Plaintiffs' RICO
claims because Plaintiffs have not established that Defendants'
alleged racketeering activity had sufficient effects in the
United States to give the Court subject matter jurisdiction.

## I.    BACKGROUND

### A.    Relevant Procedural History

Previously, Defendants moved, under Rule 12(b)(1), for the
Court to dismiss Plaintiffs' extraterritorial RICO claims for
lack of subject matter jurisdiction.  In this prior 12(b)(1)
motion, Defendants made a facial challenge, arguing that
Plaintiffs had failed to allege sufficient effects on the United
States.

The Court denied Defendants' prior Rule 12(b)(1) motion.
Wiwa v. Royal Dutch Petroleum Co., No. 96 Civ. 8386, 2002 WL
319887, at *20-21 (S.D.N.Y. Feb. 28, 2002).

Since then, the parties have completed extensive discovery.
Now Defendants make a factual challenge to the Court's subject
matter jurisdiction over these same claims.[1]  Specifically,

---

[1] "[T]he truth of jurisdictional allegations [need not] be
determined with finality at the threshold of litigation."  Jerome B.
Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 537

Defendants argue that Plaintiffs lack evidence that the alleged racketeering activity had sufficient intended and actual effects in the United States to fall within the Court's subject matter jurisdiction.

## B.   Relevant Facts

Plaintiffs' allegations span the period between 1990 and 1998, inclusive.  (Pls.' Fourth Am. Compl. ¶¶ 38-108.)  A general description of their allegations can be found in the Court's previous orders, familiarity with which is assumed.  <u>See</u>, <u>especially</u>, <u>Wiwa</u>, 2002 WL 319887.  Facts established through discovery that are relevant to deciding Defendants' Rule 12(b)(1) motion, particularly the intended and actual effects of Defendants' alleged racketeering activity in the United States, are described below.[2]

_____

(1995).  Instead, "'subject-matter jurisdiction can be called into question <u>either</u> by challenging the sufficiency of the allegation <u>or</u> by challenging the accuracy of the jurisdictional facts alleged.'" <u>Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London</u>, 147 F.3d 118, 121 n.1 (2d Cir. 1998) (quoting <u>Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.</u>, 484 U.S. 49, 68 (1987) (Scalia, J., concurring in part and concurring in the judgment).

[2] Plaintiffs submit, in opposition to Defendants' motion, certain evidence that is not relevant to the Court's analysis of its subject matter jurisdiction over Plaintiffs' RICO claims.  For instance, Plaintiffs' evidence regarding the proportion of Nigeria's foreign revenue that is earned from the oil that Nigeria exports, (<u>see</u> Pls.' Opp'n 19), does not help establish the effect Defendants' alleged racketeering activity had <u>on the United States</u>.  The Court does not consider or discuss here evidence irrelevant to determining the Court's jurisdiction over Plaintiffs' RICO claims.
    Unless otherwise noted, facts discussed herein are undisputed.

## 1.    Defendants oil operations in Nigeria

During 1990 to 1993, a company affiliated with Defendants, Shell Petroleum Development Company ("SPDC"),[3] was extracting oil from the Ogoni region of Nigeria ("Ogoni"), located in that country's Niger Delta.  During some or all of this period, SPDC operated in Nigeria pursuant to a joint venture agreement with the Nigerian government.  (Pls.' Opp'n, Ex. 1-13.)  SPDC sold oil that it produced in Nigeria to another Shell Group company for export from Nigeria.  (Pls.' Opp'n, Exs. 1-55; 3-21 at 5686.)

In 1993, SPDC ceased extracting oil from Ogoni, but it continued to extract oil in Nigeria, including from other areas of the Niger Delta.  (see, e.g., id. at Exs. 1-5 at app. 1; 1-9 at 20232-33, 20236-37, 20239; 1-12.)  SPDC also continued work on a pipeline running through Ogoni. (Id. at Ex. 1-3 at 105-111.) In 1996, SPDC developed a plan for restarting oil production in Ogoni, but by 1998, the plan was still far from complete.  (Id. at Ex. 1-48 at 1850.)

---

[3] The exact nature of SPDC's relationship with Defendants is at issue in this case.  Plaintiffs contend that Defendants (1) control SPDC, (2) can be held liable for SPDC's actions; and (3) share SPDC's intent.  (Pls.' Opp'n 15-19.)  Defendants contend that they cannot be held liable for SPDC's actions, and that SPDC's intent cannot be imputed to them.  (See, e.g., Defs.' Reply 8-9.)  For the purposes of this motion, the Court assumes, without deciding, that Defendants control SPDC in the way that Plaintiffs allege.

Documents that Defendants produced to Plaintiffs use the term the "Shell Group" to refer to the international network of Shell-related companies.  (See, e.g., Pls.' Opp'n, Ex. 1-17 at 289.)  For the purposes of this motion, the Court attributes evidence generated by Shell Group companies to Defendants.

Between January 1990 and June 1996, SPDC shipped an average of approximately 3.5 million barrels of crude oil per month from Nigeria to the United States.[4]  (Pls.' Opp'n, Ex. 3-22.)

### 2.    Ogoni opposition to Defendants' Nigerian oil operations

In the early 1990s, Ken Saro-Wiwa, the deceased father of Plaintiff Ken Wiwa, and an organization named Movement for the Survival of the Ogoni People ("MOSOP"), made demands on Defendants.  Mr. Saro-Wiwa and MOSOP protested various effects of SPDC's oil extraction, including gas flaring.  (See, e.g., Pls.' Opp'n Exs. 1-2 at 3116; 1-16 at 955; 1-17 at 290.)  In 1992, they sent a list of demands to SPDC, including a demand that the company pay to the people of Ogoni ten billion American dollars in royalties for past oil extraction and to compensate the Ogoni for SPDC's environmental damage to their land.  (See id. at Ex. 1-15.)  MOSOP's list particularly emphasized the detrimental environmental effects of SPDC's gas flares.  (See id.)

---

[4] In a letter to Plaintiffs, Defendants contend that oil SPDC shipped from Nigeria destined for the United States did not necessarily arrive in the United States because the oil cargo could, and frequently did, change ownership and/or destination en route. (Pls.' Opp'n Ex. 3-22.)  However, Defendants do not provide any evidence to support this contention.  Accordingly, for the purposes of this Order, the Court will assume that the amount of oil SPDC exported that was destined for the United States equals the amount of SPDC oil the United States imported.

### 3. Defendants' response to the Ogoni opposition[5]

Beginning in 1992, there was significant international attention paid to Defendants' operations in Nigeria, including to the issue of gas flaring. (See id. at Exs. 1-3 at 102-03; 1-5 at 58; 1-14 at 2738; 1-16 at 955; 1-17 at 290.) Even after SPDC ceased extracting oil from Ogoni in 1993, Defendants determined that the Ogoni protests were a threat to their international reputation. (See id. at Exs. 1-5; 1-16 at 955; 1-17 at 289; 2-3 at 328:10-24.)

SPDC and Defendants invested resources to counter and mitigate the protests' effect from at least 1992 to 1996. (See Pls.' Opp'n Exs. 1-16 at 956; 1-17 at 290-92; 3-8 at 4313.) However, until 1996, although Defendants planned to take some measures to avoid some instances of gas flaring, they found the prevention of gas flaring too costly to implement on a broad scale. (See Pls.' Opp'n Exs. 1-5 at 44, 48; 1-6 at 2015; 1-7 at 120; 1-8 at 5414.) In 1996, Defendants determined that gas flaring was no longer an acceptable practice.[6] (See id. at Ex. 1-9 at 20238.) They proposed accelerating their "flare reduction projects" so that they could have their "'flares out by 2005.'"

---

[5] For the purposes of this order, the Court does not consider or weigh Plaintiffs' evidence regarding Defendants' alleged racketeering activity as this evidence is not essential to deciding the jurisdictional question before the Court.

[6] Plaintiffs mistakenly state that Defendants made this determination in 1998, (see Pls.' Opp'n 2 n.4). The exhibit that they cite as support is actually dated 1996. (See id. at Ex. 1-9.)

(<u>Id.</u>)

> **4. The health of Defendants' Nigerian operations during the period of Ogoni opposition**

In 1994, SPDC was expected to achieve its financial targets, despite Defendants' concern about the "political turbulence in Nigeria." (<u>See</u> Pls.' Ex. 1-23 at 746, 750.) In 1995, Defendants reported that the country had continued its "steady decline into ungovernability," which created "challenges" for SPDC in its efforts to "sustain[] growth and continuous improvement of performance against a very tough environment." (<u>See</u> Pls.' Ex. 1-25 at 667.) In 1996, Defendants estimated that about one-quarter of its equity reserves were based in Nigeria and determined that despite the problems with its operations in Nigeria, the reserves had a "large potential," making Nigeria "a country worth investing in." (<u>See</u> Pls.' Ex. 1-1 at 570.)

## II. DISCUSSION

### A. Legal Standard

#### 1. Rule 12(b)(1) Motion to Dismiss

When a motion to dismiss under Rule 12(b)(1) challenges the factual basis for a court's subject matter jurisdiction, a court may refer to evidence outside the pleadings.[7] <u>See</u> <u>Makarova v.</u>

---

[7] When the Court denied Defendants' prior facial challenge to the Court's jurisdiction over Plaintiffs' RICO claims, it noted that "plaintiffs' allegations are perhaps less explicit than they could be." <u>Wiwa</u>, 2002 WL 319887, at *22. Plaintiffs' evidence must now provide the specificity lacking in their pleadings.

U.S., 201 F.3d 110, 113 (2d Cir. 2000) (<u>citing</u> <u>Kamen v. American</u> <u>Tel. & Tel. Co.</u>, 791 F.2d 1006, 1011 (2d Cir. 1986)).  This may include affidavits or other competent evidence.  <u>See</u> <u>Kamen</u>, 791 F.2d at 1011.

The burden is on the plaintiff asserting subject matter jurisdiction to prove, by a preponderance of the evidence, that it exists.  <u>See</u> <u>Makarova</u> 201 F.3d at 113; <u>see</u> <u>also</u> <u>Luckett v.</u> <u>Bure</u>, 290 F.3d 493, 497 (2d Cir. 2002); <u>Scelsa v. City Univ. of</u> <u>N.Y.</u>, 76 F.3d 37, 40 (2d Cir. 1996).

Where, as here, the jurisdictional facts are sufficiently separable from the merits of a claim, they may be decided by a court.  <u>Compare</u> <u>Grubart</u>, 513 U.S. at 537 ("any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively summary procedure before a judge alone"), <u>with</u> <u>Alliance for Envtl. Renewal, Inc., v. Pyramid Crossgates Co.</u>, 436 F.3d 82, 88 (2d Cir. 2006) (noting that where the overlap between jurisdictional and merits evidence "is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court must leave the jurisdictional issue for the trial").

### 2.  Extraterritorial Application of RICO

The RICO statute is silent as to its extraterritorial application.  <u>See</u> <u>North South Fin. Corp. v. Al-Turki</u>, 100 F.3d 1046, 1051 (2d Cir. 1996).  The Second Circuit Court of Appeals

("Second Circuit") has not determined what test district courts should apply in order to determine the statute's extraterritorial reach. <u>See id.</u> at 1052. However, the Second Circuit has recognized that, in determining the RICO statute's extraterritorial reach, courts have been guided "by precedents concerning subject matter jurisdiction for international securities transactions and antitrust matters."[8] <u>Id.</u> at 1052.

These precedents establish two kinds of tests, "conduct" and "effects," which assess the extent to which the otherwise extraterritorial racketeering activity involved conduct in, or had sufficient effects in, the United States. The effects test is further subdivided into a test derived from securities law ("securities-based effects test") and a test derived from antitrust law ("antitrust-based effects test"). <u>See id.</u> In either case, however, these tests apply only insofar as they serve the RICO statute's purpose, which is "to protect . . . domestic markets from corrupt foreign influences." <u>Madenes v. Madenes</u>, 981 F.Supp. 241, 250 n.6 (S.D.N.Y. 1997).

_____

[8] The Court notes that, in light of the Supreme Court's decision in <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500 (2006) (holding that only those statutory requirements that "the Legislature clearly states [are] . . . a threshold limitation on a statute's scope shall count as jurisdictional"), there is some doubt whether analyzing if a particular claim falls within the RICO statute's extraterritorial reach is, in fact, a <u>jurisdictional</u> inquiry. <u>See</u> <u>Norex Petroleum Ltd. v. Access Indus. Inc.</u>, 540 F. Supp. 2d 438, 440-41 (S.D.N.Y. 2007); <u>Republic of Colom. v. Diageo N. Am. Inc.</u>, 531 F. Supp. 2d 365, 381-82 (E.D.N.Y. 2007); <u>Ayyash v. Bank Al Madina</u>, No. 04 Civ. 9201, 2006 WL 587342, at *4 (S.D.N.Y. March 9, 2006). Neither party, however, raises this question. Accordingly, the Court does not address it.

Plaintiffs assert, and Defendants do not dispute, that Plaintiffs may establish the Court's subject matter jurisdiction by meeting either the securities or antitrust version of the effects test.[9] (See Defs.' Mem. L. 9; Pls.' Opp'n 20.) Accordingly, the Court will apply both variants of the effects test.

The securities- and antitrust-based effects tests differ: Plaintiffs must show <u>substantial</u>, <u>direct</u> effects on the United States to meet the securities-based effects test and they must show <u>intentional</u>, <u>actual</u>, and <u>substantial</u> effects on United States imports and exports to meet the antitrust-based effects test. However, the two tests are similar in that Plaintiffs must provide specific, rather than general or speculative, evidence that the alleged racketeering activity affected the United States. Plaintiffs have failed to do so here.

### a.    Securities-Based Effects Test

Statutes prohibiting securities fraud "may be given extraterritorial reach whenever a predominantly foreign

---

[9] The Second Circuit has suggested that the antitrust-based effects test may be "more appropriate" for RICO claims than the securities-based effects test because of the significant similarities between the RICO statute and the antitrust laws. Specifically, "the civil action provision of RICO was patterned after the Clayton Act" and both the RICO and antitrust statutes provide for treble damages. <u>North South Fin.</u>, 100 F.3d at 1052 (internal quotations omitted).

However, because neither party objects to the applicability of the securities-based effects test, and because the Court finds that Plaintiffs fail to meet either test, the Court need not resolve this issue.

transaction has substantial effects within the United States."

North South Fin., 100 F.3d at 1052 (quoting Consol. Gold Fields

PLC v. Minorco, S.A., 871 F.2d 252, 261-62 (2d Cir. 1989)).

Transactions "with only remote and indirect effects in the United

States do not qualify as substantial."[10]  Id.

Courts applying the securities-based effects test demand

that plaintiffs establish actual, as opposed to speculative,

substantial effects.  See Nat'l Group for Communications and

Computers, Ltd. v. Lucent Techs. Inc., 420 F. Supp. 2d 253, 261-

62 (S.D.N.Y. 2006) (holding that securities-based effects test

not met where the estimated impact on defendant's profits or

stock price was purely speculative); Roquette America, Inc. v.

Alymum N.V., No. 03 Civ. 0434, 2004 WL 1488384, at *8 (S.D.N.Y.

July 1, 2004) (finding effects test not met where plaintiffs did

not identify any specific instances in which products using their

trade secrets were made or sold in the United States); Nuevo

Mundo Holdings v. Pricewaterhouse Coopers LLP, No. 03 Civ. 0613,

_____

[10] Defendants urge the Court, (Defs.' Mem. L. 10-11), to follow
its sister court and further require that, in order to meet the
securities-based effects test, plaintiffs establish that they,
themselves, were harmed in the United States by Defendants' alleged
racketeering activity.  See, Norex, 540 F. Supp. 2d at 446.
Plaintiffs urge the Court not to follow this approach because the
Second Circuit has not adopted the United States injury requirement.
(Pls.' Opp'n at 22).
    As explained infra part II.C.1, Plaintiffs have not provided
sufficient evidence that Defendants' racketeering activity affected
anyone in the United States substantially and directly.  Accordingly,
the Court need not reach the question of whether Plaintiffs must
particularly demonstrate that they, themselves, were harmed in the
United States by Defendants' alleged racketeering activity.

2004 WL 2848524, at *4 (S.D.N.Y. Dec. 9, 2004) (holding that plaintiffs' allegation that defendant's racketeering activity caused United States investors to lose value on their investments, unaccompanied by information regarding the number of United States investors affected or the amount of their monetary loss, was too vague and conclusory to support a court's jurisdiction). <u>See</u> <u>also</u> <u>Nasser v. Andersen Worldwide Societe Cooperative</u>, No. 02 Civ. 6832, 2003 WL 22179008, at *6 (S.D.N.Y. Sept. 23, 2003).

In addition, where there are multiple intermediary steps between the alleged racketeering activity and the effect on U.S. markets, courts find that plaintiffs fail to meet the securities-based effects test. <u>See Boyd v. AWB Ltd.</u>, 544 F. Supp. 2d 236, 252 (S.D.N.Y. 2008) (holding that an extraterritorial monopoly's effect on United States prices was too indirect where it was only "one factor among many" determining those prices); <u>Lucent</u>, 420 F. Supp. 2d at 262 (finding cascading cancellation of contracts with United States businesses, which resulted after the alleged racketeering activities caused the cancellation of a contract with a foreign company, too "remote and indirect") (internal quotations omitted); <u>Alymum</u>, 2004 WL 1488384, at *8 (finding effects too indirect where plaintiffs' trade secrets were transferred to a United States company via an intermediary); <u>Giro v. Banco Espanol de Credito</u>, No. 98 Civ. 6195, 1999 WL 440462, at

13

*3 (S.D.N.Y. June 28, 1999) (deeming "four intermediate effects that led to the loss in the United States" too "remote and indirect").

### b.   Antitrust-Based Effects Test

Antitrust statutes may reach anticompetitive behavior occurring outside the United States "if the conduct is intended to and actually does have an effect on United States imports or exports which the state reprehends."  North South Fin., 100 F.3d at 1052 (citing United States v. Aluminum Co. of Am., 148 F.2d 416, 443-44 (2d Cir. 1945).  Under the antitrust statutes, the foreign conduct's effect in the United States must be "substantial."  Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796 (1993).

In applying the antitrust-based effects test, courts have required that plaintiffs' evidence be specific.  See Norex, 540 F. Supp. 2d 438, 448 (finding general allegations of American shareholder losses and unfair competitive advantages in United States oil markets insufficiently specific to support subject matter jurisdiction over an extraterritorial RICO claim); Nuevo Mundo, 2004 WL 2848524, at *4 (deeming insufficient general allegations of United States investors' losses, unaccompanied by specific information about the number of investors affected or the amount of their losses).  See also Nasser, 2003 WL 22179008, at *6.

**B.    Summary of Arguments**

**1.    Plaintiffs' Arguments**

Plaintiffs argue that Defendants engaged in racketeering activities with, <u>inter alia</u>, SPDC and the Nigerian government to suppress MOSOP and its opposition to SPDC's operations in Ogoni as well as to "diminish[] Ken Saro-Wiwa's influence."  (Pls.' Opp'n 2.)  According to Plaintiffs, Defendants' racketeering activity (1) protected Defendants from "a challenge to SPDC's manner of operations and Defendants' international position," (Pls.' Opp'n 4), (2) allowed Defendants to avoid meeting MOSOP's multi-billion dollar demands, and (3) allowed Defendants to avoid addressing the environmental hazards, including gas flaring, that MOSOP and Mr. Saro-Wiwa were protesting.[11]  (<u>See</u> Pls.' Opp'n 1-2, 4.)  Defendants wanted to avoid these costs in order to minimize the expense and maximize the profits of extracting the Nigerian oil that they ultimately intended to export to the United States. (Pls.' Opp'n 20-21.)

Plaintiffs further argue that Defendants' racketeering

_____

[11] Previously, Plaintiffs alleged that Defendants engaged in their racketeering activity in order to (1) prevent MOSOP and Mr. Saro-Wiwa's protests from interfering with Defendants' oil production in Ogoni, (<u>see</u>, <u>e.g.</u>, Pls.' RICO Statement, 96-D.E. 10, at 20-22), or (2) prevent the Ogoni protests from spreading to Defendants' other oil producing areas in Nigeria, (<u>see</u> Order, November 6, 2008, 96-D.E. 283, at 5).  Plaintiffs do not make the former argument in response to this motion; the evidence they cite does not support the latter argument.  Accordingly, the Court does not consider them herein.  However, the Court notes that these alternate purposes would not change the Court's analysis of the effect of Defendants' alleged racketeering activity on the United States.

activities affected the United States both through the United

States' import of Defendants' Nigerian-produced oil and through

the sale of Defendants' stocks and ADR in the United States.

Plaintiffs observe that SPDC's oil entered the United States

market, although they are not clear precisely how this affected

the United States.[12]  (Pls.' Opp'n 3.)  Plaintiffs also contend

that SPDC's oil affected the United States because it allowed

Defendants to sell stocks and American Depository Receipts

("ADR") in the United States that offered investors a higher

margin of return than they would have had if Defendants had met

MOSOP and Mr. Saro-Wiwa's demands.[13]  (Pls.' Opp'n 3.)

_____

[12] Plaintiffs make no claims, nor do they offer any evidence,
regarding how Defendants' oil affected the United States, e.g. by
being sold at lower prices.  They seem to assume that the fact that
Defendants' oil entered the United States is, in and of itself,
evidence that it affected the United States sufficiently for the Court
to assume jurisdiction over Plaintiffs' RICO claims.  It is not.
    The closest Plaintiffs come to suggesting a theory of how
Defendants' oil affected United States commerce is Plaintiffs'
assertion that Defendants were able to produce oil at a lower cost
than other Nigerian producers.  (See Pls.' Opp'n 1-2.)  Perhaps
Plaintiffs mean to suggest, although they do not state, that, to the
extent that the United States imported these other Nigerian producers'
oil, Defendants had a competitive advantage in the United States over
these other Nigerian producers.  If so, Plaintiffs provide no evidence
to support this contention.  These other producers (1) may not have
made any costly investments that Defendants avoided, and/or (2) may
have also benefitted from Defendants' alleged racketeering activities.
    Accordingly, Plaintiffs offer evidence only that Defendants' oil
entered the United States market.  They do not allege or establish
how, or how substantially, it affected United States commerce.

[13] Plaintiffs characterize this as a "competitive advantage" but
they do not identify any person or entity against whom Defendants
enjoyed this competitive advantage.  (Pls.' Opp'n 3.)  Plaintiffs
appear to assume that, if Defendants lowered their costs of producing
oil in Nigeria by engaging in the alleged racketeering activity rather
than meeting protesters' demands, Defendants were able to translate

16

## 2. Defendants' Arguments

Defendants argue that Plaintiffs' contention that the Court has jurisdiction over Plaintiffs' RICO claims lacks evidentiary support. In particular, they contend that Plaintiffs have failed to offer any specific proof (1) that Defendants had a competitive advantage in the sale of their oil, stocks, or ADR in the United States, (see Defs.' Reply 3, 5); or (2) that any effect Defendants' alleged racketeering activities had on the United States was direct or foreseeable, (see id. at 5).[14] (See id.)

## C. Analysis

In order to meet the securities-based effects test, Plaintiffs must show substantial, direct effects on the United States. They must show intentional, actual, and substantial effects on United States imports and exports to meet the antitrust-based effects test. Both tests require Plaintiffs to provide specific, rather than general or speculative, evidence that the alleged racketeering activity affected the United States.

Plaintiffs have not proven by a preponderance of the

---

these lower costs into higher profits. However, Plaintiffs do not specify how, or document that, Defendants were actually able to do so. See infra, pt. II.C.1.b.

[14] Because the Court finds that Plaintiffs do not prove by a preponderance of the evidence that Defendants' alleged racketeering activity had sufficient effects in the United States to justify the Court's jurisdiction over Plaintiffs' RICO claims, the Court does not reach Defendants' argument that principles of comity bar its assumption of jurisdiction. (Defs.' Mot. 14-15.)

evidence that Defendants' alleged racketeering activity had sufficient effects, under either the securities-based or the antitrust-based effects tests, to establish that the Court has subject matter jurisdiction over Plaintiffs' RICO claims.

### 1.  Securities-Based Effects Test

Plaintiffs have not established either (1) that Defendants' alleged racketeering activity lowered their costs of producing oil in Nigeria ("Nigerian production costs"), or (2) if Defendants did have lower production costs in Nigeria, that these lower costs resulted in greater investment returns or otherwise affected commerce in the United States ("United States effects"). As a result, Plaintiffs have not established that Defendants' racketeering activities had an <u>actual</u> substantial and direct effect within the United States, as needed to meet the securities-based effects test.

### a.  Nigerian Production Costs

Plaintiffs have not proved that Defendants' racketeering activities lowered their costs of producing oil in Nigeria.  In a similar case involving alleged human rights abuses related to oil exploration in Nigeria, <u>Bowoto v. Chevron Corp.</u>, the court dismissed the plaintiffs' RICO claim because it found that they had "fail[ed] . . . to provide any evidence that defendants' treatment of the environment, the local community, oil protestors generally, or these specific plaintiffs . . . [at *] save[d]

defendants money, or otherwise increase[d] their profit margin."
481 F. Supp. 2d 1010, 1014-1015 (N.D. Cal. 2007). The court
noted that it was "equally likely that defendants' alleged
exploitation and abuses have led to increased instability and
violence in the region, resulting in increased production costs
and decreased output." Id. at 1015 n.3. The court also observed
that "defendants' alleged actions might have had both deleterious
and beneficial effects, resulting in no net impact." Id.

Plaintiffs contend that they have succeeded where the Bowoto
plaintiffs failed. The Court disagrees. Plaintiffs have
provided evidence that the preventive and remedial measures that
the Ogoni protestors demanded from Defendants were costly - more
costly than the Defendants were initially willing to spend.
(See, e.g., Pls.' Opp'n Ex. 1-5 at 44, 48.)

However, although Plaintiffs contend that they have also
demonstrated that Defendants' alleged racketeering activities
created a net saving for Defendants, (see Pls.' Opp'n 21), they
have not done so.

Plaintiffs' evidence that Defendants' racketeering activity
saved Defendants' money is insufficient. Plaintiffs assume that
Defendants had to choose between racketeering or paying for the
remedial and preventive measures protesters demanded.[15] Even if

---

[15] The Court notes that this may not be a necessary assumption.
Faced with protests, Defendants could have chosen to neither suppress
the protests nor meet the protesters' demands. For instance, they

Defendants had to choose between investing in prevention and remediation or in racketeering activities, Plaintiffs have not proven that the alleged choice to invest in racketeering activity was less costly. Plaintiffs' only evidence that it was less costly for SPDC to engage in racketeering activity is the fact that SPDC predicted that it would meet its projected business goals for 1994,[16] (see Pls.' Opp'n Exs. 1-23 at 750; 1-24 at 765), a year in which the Defendants were allegedly engaging in racketeering activity rather than investing in these costly alternatives.

There are at least three ways this evidence does not support Plaintiffs' conclusion. First, just because Defendants projected that they would meet their business goals for the year does not establish that they actually did meet those goals. Second, even if Defendants did meet their goals in 1994, this fact, on its own, does not demonstrate that, in meeting these goals, Defendants' costs were lower than if they had instead invested in

_____

might have instead chosen to launch a public relations campaign against the protesters, or do nothing at all.

[16] The other evidence Plaintiffs cite in support of the proposition that "[a]ny costs Defendants incurred as a result of violence or instability in the region did not substantially affect their business" do not support this proposition. (Pls.' Opp'n 4 n.6.) Specifically, to the extent that the 1994 internal Shell memorandum Plaintiffs provide mentions the state of SPDC's business, it reports that the company's production was dropping and that it was "taking a lot of pain" because of changes in the Nigerian economy. (See id. at Ex. 1-22 at 10084.) The cited page of the "1995 Country Business Plan," also does not provide any relevant information. (See id. at Ex. 1-25 at 665.)

the remedial and preventive measures Ogoni protesters demanded.

Defendants' ability to meet their business goals does not

establish the relative costs of racketeering versus remediation.

Third, even assuming that Plaintiffs have shown that, in 1994,

racketeering was less costly than remediation, this fact alone

would not support Plaintiffs' contention that <u>overall</u>

racketeering was less costly than remediation.  For instance, if

Defendants' alleged racketeering activities increased violence

and instability in Nigeria, as the <u>Bowoto</u> court hypothesized that

they might, presumably the resulting costs would accrue over the

long term, not immediately.  As a result, evidence from one year

alone does not demonstrate the overall relative impact that

Defendants' alleged choice to invest in violence and repression,

rather than remediation or prevention, had on their production

costs.

### b.    United States Effects

Even assuming, <u>arguendo</u>, that Defendants' alleged choice to

invest in repression rather than remediation lowered Defendants'

Nigerian production costs, Plaintiffs' arguments would still fail

because Plaintiffs do not establish that these lower costs

affected the United States.  The only specific evidence

Plaintiffs provide that could help the Court establish how

substantial an effect Defendants' alleged racketeering activity

had within the United States is the gross amount of oil per month

that SPDC exported to the United States. (See Pls.' Opp'n Ex. 3-22.) But Plaintiffs provide <u>no</u> evidence that would allow the Court to determine how substantial an effect this oil had on the United States.[17] For instance, Plaintiffs provide no evidence regarding what proportion of the oil that the United States imported during the relevant period originated from Defendants' Nigerian operations; how Defendants' lower Nigerian production costs affected the oil they produced, e.g. through lower prices or higher profits, once that oil reached the United States; or that this activity altered the rate of return on Defendants' stocks and ADR.[18] Thus, even if Plaintiffs' evidence supported

---

[17] The Court cannot use the other evidence Plaintiffs provide regarding United States effects. Plaintiffs provide evidence that, at some point in time, nearly half of Nigeria's oil was exported to the United States, most of it oil that had been produced by SPDC. (<u>Id.</u> Ex. 2-2 at 105: 15-18.) This evidence does not help establish the Court's jurisdiction over Plaintiffs' RICO claims because (1) this proportional measure does not help the Court quantify the impact of Defendants' oil in the United States, and (2) even if the Court could use this information to quantify the impact of Defendants' alleged racketeering activity in the United States, Plaintiffs do not indicate for what years this information was true.

Plaintiffs also provide a news article that states that Shell accounts for nearly half of Nigerian oil output and that Nigerian oil accounts for almost ten percent of United States oil imports. (See Pls.' Opp'n Ex. 3-23 at b-2.) However, the Court cannot use the article to help determine the impact of Defendants' alleged racketeering activities on the United States, in part because the article, which was published in 2002, does not state for which years these facts hold true.

[18] The Court does not decide whether these types of evidence are necessary or sufficient. They are listed only as examples of how Plaintiffs <u>might</u> have sought to prove United States effects. The Court's decision rests on Plaintiffs' lack of <u>any</u> evidence other than the gross number of barrels of Defendants' Nigerian oil that the United States imported. Regardless of what evidence <u>would</u> suffice, this evidence does <u>not</u> suffice.

the conclusion that Defendants' alleged racketeering activity

lowered their Nigerian production costs, Plaintiffs have not

provided <u>any</u> evidence that these lower costs affected the United

States in the form of lower prices, higher investment returns, or

in any other way.

Speculative claims about general effects on commodity prices

or stock values do not satisfy the securities-based effects test.

<u>See</u>, <u>e.g.</u>, <u>Lucent</u>, 420 F. Supp. 2d at 261-62; <u>Nuevo Mundo</u>, 2004

WL 2848524, at *4.  Accordingly, Plaintiffs have not established

that Defendants' alleged racketeering activity affected the

United States, substantially or otherwise.[19]

### 2. Antitrust-Based Effects Test

Plaintiffs also do not establish that Defendants' alleged

racketeering activity was intended to, and actually did, affect

United States imports and exports.

The antitrust-based effects test, like the securities-based

effects test, requires that a plaintiff provide <u>specific</u> <u>evidence</u>

that a defendant's alleged racketeering activity affected the

United States.  As discussed above, even assuming that

Defendants' alleged racketeering activity lowered their Nigerian

---

[19] Plaintiffs' theory of a United States effect involves
Defendants' racketeering activities leading to cost savings that in
turn lead to higher investment returns in the United States.  The
Court notes that this theory, in addition to being too speculative,
may also be too indirect to meet the securities-based effects test.
<u>See</u> <u>Boyd</u>, 544 F. Supp. 2d at 252 (holding effects on United States
prices too indirect where the racketeering activity was only "one
factor among many" determining those prices).

production costs, Plaintiffs provide no specific evidence that these lower costs resulted in lower oil prices or higher investment returns in the United States. See Norex, 540 F. Supp. 2d at 448 (finding general allegations of effects on American oil commodity and investment markets insufficient to support a court's subject matter jurisdiction over an extraterritorial RICO claim). Accordingly, Plaintiffs do not meet the antitrust-based effects test.[20]

### D. Conclusion

Plaintiffs have not established that Defendants' alleged racketeering activity had the substantial, direct effects on the United States necessary to meet the securities-based effects test. In addition, Plaintiffs have not established that Defendants' alleged racketeering activity was intended to, or did, affect United States imports and exports sufficiently to meet the antitrust-based effects test. Accordingly, Plaintiffs have not met their burden of proving that their extraterritorial

---

[20] The Court notes that Plaintiffs' theory of intent, that Defendants engaged in racketeering activity to minimize the expense of extracting Nigerian oil so as to affect the United States, also is not sufficiently supported by evidence. First, as explained above, Plaintiffs have not established that Defendants' alleged racketeering activity actually did lower their costs. Second, Plaintiffs have not established with sufficient specificity the proportion of Defendants' Nigerian oil that was exported to the United States. See supra note 17. Such evidence is necessary to support Plaintiffs' claim that enough of Defendants' Nigerian oil was exported to the United States to establish that Defendants undertook their alleged racketeering activity in order to affect the United States, in addition to, or as opposed to, other countries. (Pls.' Opp'n 20.)

RICO claims fall within the Court's subject matter jurisdiction.

## III. CONCLUSION

For the above reasons, Defendants' Rule 12(b)(1) motion to dismiss, 96-D.E. 308, Plaintiffs' extraterritorial RICO claims as outside the Court's subject matter jurisdiction is GRANTED.

SO ORDERED.

Dated:     New York, New York
           March 18 , 2009

_Kimba M. Wood_
Kimba M. Wood
United States District Judge